RICHARD D. BOOKER ET AL. V. PHILIP PUYEAR

[FILED SEPTEMBER 17, 1889.]

1. **The Petition** *held* to state a cause of action against each of the defendants.
2. **The Evidence** considered, and *held*, that upon it, and under the law of the case, the verdict and judgment must be upheld.

ERROR to the district court for York county. Tried below before NORVAL, J.

*Scott & Gilbert*, and *Breckenridge & Breckenridge*, for plaintiffs in error Allen Brothers:

The petition is insufficient, and the verdict contrary to law.    Something must be done which would give the right of action independent of the conspiracy, to make the latter the subject of a civil action. (Cooley on Torts, 125, and cases cited; Bailey, Onus Probandi, 49.)    And the plaintiff must show actual damage as a result thereof. (*Kimball v. Harman*, 34 Md., 407; 6 Am. Rep., 340.)

*France & Harlan*, for defendants in error:

The petition states the essential elements of a cause of action as required by the Code. (*Neudecker v. Kohlberg*, 81 N. Y., 296; *Moore v. Tracy*, 7 Wend., 229.)    Conspiracy may be inferred from circumstances. (*Jones v. Baker*, 7 Cowen, 445; *Forsyth v. Edminston*, 11 How. Pr., 408.)    The foundation of the action is the damage done, not the conspiracy. (*Place v. Minster*, 65 N. Y., 89, 95, 97; *Hutchins v. Hutchins*, 7 Hill [N. Y.], 104; Cooley on Torts, 126 and cases cited.)    The act of one conspirator is the act of all. (*Hamilton v. Smith*, 39 Mich., 223; *Beebe v. Knapp*, 28 Id., 53, 66.)    Participation in a conspiracy may be only as to plan, etc., and all are participators, if the act is

in their interest. (Cooley on Torts, 127.) The only feasible mode of proof is to show such concert of action as would imply a common arrangement. (*Dayton v. Monroe*, 47 Mich., 193); and the evidence required is necessarily circumstantial (3 Green. Ev., sec. 93, p. 96).

COBB, J.

This action is brought on error from the district court of York county.

Philip Puyear, the plaintiff below, brought his action for conspiracy against John W. Hinckley, Richard D. Booker, and Arthur A. Allen and Edgar H. Allen, partners in trade as Allen Bros., doing business at Omaha, alleging that on January 1, 1887, and prior thereto, the defendant Booker and the plaintiff were partners in the retail grocery business at York, doing a prosperous business, in which plaintiff had invested $1,000, and the good-will of the business was valued at $500; that on said day the defendants unlawfully entered into a conspiracy to break up his said business and defraud the plaintiff of his money invested, and of the good-will of the business, in pursuance of which they agreed together that Booker should buy of plaintiff a one-half interest in said business under the pretense of a fair and *bona fide* purchase, but intending not to pay for the same, and that the half interest should be delivered to Booker before payment, and that he should then declare himself insolvent, dispose of his property, and refuse to pay any of the indebtedness of the business, and inform Allen Bros., to whom the business of plaintiff and Booker owed $267 for groceries, that they should come and superinduce plaintiff to give a bill of sale to them of his half interest in said business, and that at the time of making and securing the bill of sale the defendant Hinckley should come forward and claim that he owned a half interest in the grocery business which he had purchased of

Booker; and to induce plaintiff to make the bill of sale to Allen Brothers that they should falsely promise the plaintiff and agree to take out of said business only groceries sufficient, at the market price, to pay them their debt of $267, and turn over the balance to plaintiff, and to furnish plaintiff sufficient groceries, in addition thereto, to carry on a grocery business at the place and in the building in which the business was then situate; and that they should falsely represent to the plaintiff that if he would sign such bill of sale Hinckley would also sign it; and that they should further represent that said business should be turned back to plaintiff in a few hours after the bill of sale should be given to them, and that the plaintiff, in the interval, should stand on the sidewalk in front of his store and tell his customers that his business would be opened up in a short time and he would go on with the business, and that Allen Brothers should put upon the store door the notice : " Invoicing ; will be open soon ; " and that they should, after obtaining such bill of sale and possession of the groceries and store room, sell or pretend to sell all of the groceries for sufficient only to pay said indebtedness to them — $267 — and costs and expenses of sale; that Booker and Hinckley should thus come into the possession, and thus become the owners of said groceries, although, in fact, the same, and the good-will, were of the value of $1,500 ; and that each of said representations, promises, and agreements was fraudulent and false.

That, in pursuance of said conspiracy, the defendant Booker, on the 29th of December, 1886, under pretence of a *bona fide* purchase, obtained from plaintiff the one-half interest of said grocery business, and took possession of it, and declared himself insolvent, disposed of all his property, refused to pay any indebtedness of the grocery business, and so informed Allen Brothers, who then came and promised and superinduced the plaintiff to give them a bill of sale of his half interest in the grocery business, and to induce

plaintiff to make such bill of sale they falsely and fraudu-
lently agreed to take out of said business, groceries suf-
ficient to pay their debt of $267, and no more, and to turn the
balance back to plaintiff, and to furnish him sufficient
groceries to carry on a business at the place, and in the
building at which the same then were; and that Hinckley
would also sign the bill of sale, and that the grocery busi-
ness should be turned back to plaintiff within a few hours
after signing the bill of sale; and the plaintiff stood in
front of the store building, in which the business had been
carried on, and told his customers that his business would
be opened up in a short time and be carried on in his own
name; and Allen Brothers put on the door of the store
building the words, "Invoicing; will be open soon." And
after getting possession of the groceries and the store room,
Allen Brothers sold and disposed of, or pretended to sell
and dispose of, all of said groceries, and Booker and Hinck-
ley became or pretended to become the owners thereof, and
thus the defendants, by fraud and conspiracy, defrauded the
plaintiff of all of his groceries, and the business, and of
the money the plaintiff had then invested, and his good-
will therein, valued at $1,500, whereby the same is lost
to the plaintiff, to his damage in that amount, no part of
which has been paid, wherefore he prays judgment, etc. The
defendants Booker and Hinckley answered separately, de-
nying the allegations of the plaintiff. The defendants Allen
answered specially, objecting to the jurisdiction of the court;
that the petition does not show that they are jointly liable
with the other defendants, or either of them, on the cause
of action set up; and that they are residents of Douglas
county; that service on them was not made in York county;
and that the petition which charges a conspiracy against
them and the other defendants does not state facts sufficient
to give the court jurisdiction of the persons of defendants.
This plea was argued by counsel and was overruled by the
court; the defendants on leave answered, generally, deny-

ing every allegation of the plaintiff. There was a trial to a jury, with verdict for the plaintiff, assessing his damages at $311.20. The defendants' motion for a new trial having been overruled, judgment for the plaintiff was entered upon the verdict.

The case is now brought to this court on numerous exceptions to the proceedings and judgment of the court below. The evidence, preserved in the bill of exceptions, is voluminous and conflicting. The testimony of the plaintiff, who was examined as a witness on his own behalf, was evidently believed by the jury, and, so far as this court of review is concerned, must be taken as credible and true if not found to be inconsistent in itself. From his testimony it appears that in November and December, 1886, the plaintiff was carrying on a small grocery business in the town of York. Looking at his testimony alone, and without making allowance for the peculiar manner of his examination by counsel, it would appear upon the first reading that he was in the business by himself; but on examining it by the light of other testimony it appears, without discrediting any of his statements, that at the time he was in partnership with one Kempton. The plaintiff had invested in his business about $1,000; Kempton had invested really nothing except his note to the plaintiff for $400. On December 27, 1886, the defendant Booker succeeded to the partnership of Kempton, by purchase from Kempton, or the plaintiff, or from both; the fact is not clear, but it is shown that Kempton's note was given up, and Booker's for a like amount was substituted. The plaintiff testifies that it was his understanding and argument with Booker, when he came into the business, that he was to pay plaintiff this $400; that he then represented to plaintiff that he had the money in the bank to pay it, and that he was also to pay one-half of the bills then to be paid by the partnership, for which he represented that he had the money. On the next day he came into the store, and, upon looking over the book

accounts, said that there was not as much on the books as Kempton had represented; and he then declared, in emphatic and bad language, that he would not put any money into the concern. Plaintiff then talked to him in a friendly manner, telling him that he would not be able to carry him, and that he would be obliged to sue him if he didn't pay; Booker replied that plaintiff couldn't make it out of him, and that he wouldn't pay a cent. Plaintiff then appealed to F. J. Ferguson, the agent and travelling man of defendants Allen, who lived in York, and he said that he would see Booker, and talk with him, and see that the matter was fixed up. Ferguson afterwards did see Booker, as he stated, but Booker would do nothing, and Ferguson promised to write to Allen Brothers, at Omaha, and told the plaintiff not to be uneasy, that they wouldn't hurt him; that he would write for one of them to come up; that afterwards, on January 19, 1887, in the afternoon, Booker came into the store and proposed to plaintiff to buy his remaining half interest in the business. The language of the plaintiff's testimony is:

"Well, I thought about it, and told him to pay me $700 cash, and I would do it. I thought it was better to get out than to be there in the way, and if he would pay me I would get out; and he wanted me to wait on him for the money; I told him I didn't want to wait, that I wanted to go into business again and would have to have the money; and then he and Hinckley stepped out and were gone a few minutes and then came back, and it wasn't over ten or fifteen minutes before Mr. Allen and his attorney came in. Mr. Allen began to talk and I looked over the account books and said to him, 'I just owe you two dollars on your bills, that is, back payments;' and he said to me, 'that is just exactly what you owe me;' well, I told him that I didn't know, that Ferguson said he would send down for you, what for, I didn't know; I didn't know what good he could do me, and wanted to know 'if he was going to shut

me up?' He said no, not to be uneasy about what I owed him, that I had always paid promptly; he said not to be uneasy, that the trouble would all be fixed up; that he would try and straighten up with Booker and get him out of there and have things running all right again." The witness also testified: "I told him Booker was here, and Mr. Allen stepped down to talk with Hinckley a minute or two, and came back and informed me that 'Hinckley was a member of the firm, and owned half the store.' I told him that was the first I knew of it, that Hinckley was a man that didn't own anything; that he had been working all winter for his board, and so he and the attorney went to where Hinckley was standing and talked with him, and I went about the store attending to my business, and then went to supper and came back, and Allen sent for Booker who came in and they spent the evening talking with others there at the other end of the store."

Q. Who did they spend the evening with?

A. Allen, and his attorney, and Booker, and Hinckley.

Q. Talking together at the other end of the store?

A. Yes.

Q. What were you doing?

A. I was attending to my business. I never heard anything that was said at all. About half past eight o'clock Mr. Allen came and took me to the lower end of the store and said: "Puyear, I see how this trouble is, Booker has sold out and turned the whole thing over; there is but one way to get out and save trouble; that is, in the evening I want you to come forward,—my attorney will make a bill of sale out,—we want to get Hinckley into it, and you just step forward and sign the bill of sale first, and then we will go ahead and take an invoice of the store, and when we get through we will keep so much for ourselves, kick Hinckley out, he has not paid but $50 anyhow, pay him up his $50, and kick him out, and turn it over to you, and just furnish you goods right along." And then Allen went

down, and was gone ten or fifteen minutes; and then his attorney took me aside and told me just the same thing over again.

Q. Who was the attorney?

A. I think they called him Fitz.

Q. Is this the gentleman here?

A. Yes, sir; I think so.

The witness answered to the

Q. Well, what occurred then?

A. The attorney told me the same thing, and I said to him, Look here, I have thought of another thing: suppose after I go and sign the bill of sale you should sell out the whole stock at forced sale; it wouldn't bring $400, and it would leave me in a bad place; all I have got is right here; and he said he wouldn't think of the like. Well, they talked so fair, that I agreed to sign the bill of sale; so we adjourned that night and I gave up the key, and Hinckley stepped forward and handed over, as well as I remember, $34.10 that was in the drawer. * * *

Q. What key was that—key to the business?

A. I went out and took it to Mr. Allen's attorney; he and Allen were standing in front of the store, and the attorney said: "Booker wants me to take the keys until to-morrow morning." I thought he wanted to keep the keys from Booker, and so I told my son to lock the door and give the key to Mr. Allen, and he did so. Then the next morning I came up and went into store to see about the invoicing; when I got in Mr. Allen took me to the lower end of the store and said, "Whenever we bring forth the bill of sale," he says, "you step forward and sign it, and then we will go ahead and have everything ready." So I had no more than got back before his attorney took me off again and told me the very same thing, and I told him I would sign the bill of sale; and then Mr. Allen took me back and showed me a statement they had drawn up,—they had looked over the goods, and the items I don't remember, but there

was in the store for me about $366 coming to Hinckley and me apiece, and $267 for them.

Q. He said there was that amount of goods?

A. Yes, sir; they were satisfied there was that amount of goods then.

Q. What occurred then?

A. Well, I went out and my son came out and told me they wanted to see me, and I went in, and the attorney holloed to me "to come around and sign the bill of sale, sign it quick, quick! quick!" he says, "we want to get Hinckley into it." "Now," he says, "Mr. Hinckley, you come in and sign it, and he can go to hell," that's all.

Q. Then what?

A. They had put on the door, "*Invoicing: will be open soon.*"

Q. Who put it there?

A. I suppose Allen, or the attorney; they appeared to be running things.

Q. Then what occurred?

A. He came up and peeped out over the door, Allen did, and spoke to me, and said, "you are going back in business now;" again he said, " now you go out and tell people we are invoicing, and will be open soon, and you are going back in business." So, I went out and told them when any one asked me, there was a little trouble between myself and Booker, and we should commence again that evening. I stood out for some time and then went in at the back door; they wanted me to go home, but I stood around; I wanted to keep Hinckley away from there, but they wanted him to stay, and me to go, and so I went home, and left Hinckley in the store. I staid till noon and came back and it was closed yet, and the sign was there yet. I went in at the south door, and Hinckley was there still; they spoke and said they had concluded to send the goods around to different stores, and I could get them together after I commenced business. So I went on

about my business, thinking it would be all right.  I thought they would do what was right by me, and I went home and laid down.   After about nine o'clock I went to the store and called him [Allen] out, and said, "I understand you are going ahead to sell the whole thing out; I will never give my consent to that; everything I have is in that store."  "Oh, no," he said, "we are going ahead and selling these goods; it is paying us enough; there will be some $700 of goods left; we have got a bill of sale of these goods; Hinckley has signed it, and we have got to do it, as a turn, I suppose, and then we will turn them over to you, and look you out a location, a good one, where business is not so much overdone; we will get Ferguson to look you up a good location.   *   *   *

Q. At that time did you see the attorney of Allen Brothers?

A. Yes, sir; after Allen left he came up to me, and told me the very same thing, word for word.

Q. What next occurred?

A. He told me to take the books home, that Hinckley had no right to them, that he had nothing in the store; and so I just took the books on home, and went to bed, and slept sound, and thought everything was going on nice.   I didn't see anything more of them until next morning, between nine and ten o'clock, I met Allen on the street corner near the First National Bank, and asked him how the thing was going along?  He said, "Smoothly; they got out about $75 worth of goods the night before, and a few that morning," and he said, "I'll bet this morning there is more than $500 worth there now; and we are holding them goods up to get all out there is in them.   I told him that was what I wanted.   The next thing I saw of them was at half past three o'clock, he and his attorney came to me and said "that there wouldn't be anything left; it would take everything to pay Allen's bill;" and Mr. Allen made some remarks—that was the first I knew I was

robbed.  I never said a word, I knew it wasn't any use to talk to them; I would have to go to a higher authority to get anything out of them.

Q.  State whether you ever saw any of those goods afterwards, and if so, where?

A.  The next I saw of them was here, on the west side of the square, in the possession of Hinckley & Booker.

Q.  In a store there, were they?

A.  Yes, sir.

Q.  Were those the goods you had in your store?

A.  They were.

Q.  How many did you see there?

A.  It looked like there might have been $500 worth or more.  *   *   *

Q.  After you saw those goods in Hinckley & Booker's possession was there anything said by you to them, and if so, what was the conversation?

A.  I had a conversation with Hinckley, he said the agreement with Allen Brothers was that they should turn the goods over to him; Booker said that Hinckley had passed into the possession of the goods.

In reply to counsel the plaintiff stated that there was about $1,000 worth of goods when defendants took possession, and about $115 worth of fixtures; that Hinckley & Booker took the fixtures, he understood, and they were over there in their store.  This is the pith and strength of the plaintiff's testimony, as given in his own behalf, on his examination in chief.  There was a cross-examination at length, but, as it appears, without material difference or effect as to the credibility and value of his evidence.  There was also called a number of witnesses who testified in his behalf and corroborated his statements generally as to the value of the goods, and in some other respects.

The defendants also called and examined a number of witnesses, including Arthur Allen, the defendant T. J. Ferguson, the traveling man, Booker and Hinckley, and

others. It may be said, in general terms, that some one, or more, of these witnesses contradicted the plaintiff's testimony in every material particular. Nevertheless, as before stated, it is significant that the jury believed the candid story of the plaintiff, and disbelieved that of the defendants, and the witnesses who contradicted him. As has been often laid down in the highest courts, the preponderance of evidence does not necessarily consist in the number of witnesses testifying to particular facts, but in characteristics which shed light on the controversy, and inspire confidence in the truth of the evidence. The consistency of testimony with other acknowledged facts, the candor and ingenuous demeanor of witnesses or the subtlety and artifice with which they testify, their interest in the issue, and their self defenses, their readiness to correct misrepresentations, or the pertinacity with which they adhere to doubtful statements, are elements in determining the weight of evidence.

It was doubtless considerations of like nature that induced the jury to believe the plaintiff's evidence, when in some important particulars he was "withstood to the face" by more than one of the defendants.

The law of the case was given to the jury in eleven impartial and well considered instructions, neither party taking exceptions to any. The errors relied upon by counsel in the brief are:

1. In admitting any evidence against Allen Brothers, the petition not stating a sufficient cause of action against them.

2. The verdict is not supported by evidence.

3. That the verdict is contrary to law.

By the initial statement it will be seen that a considerable part of the petition alleges conspiracy against all the defendants. In this the pleader followed a prevailing custom in like cases. It was probably drawn from the precedent of *Neudecker v. Kohlberg*, 81 N. Y., 296, cited by

counsel for defendant in error, in which the action was lost for want of evidence, and not for want of a skillfully drawn petition. The plaintiff's counsel, in brief, fails to point out specifically where and how the petition has failed to allege a sufficient cause of action against either, or all, of the defendants.

The real cause of action presented by the petition is, that the plaintiff, who was in possession of the one-half interest of a stock of groceries, valued at $1,000, was induced to sign a bill of sale of his interest for the ostensible purpose of enabling the defendants Allen to take from the whole stock $267, the indebtedness of the plaintiff and his partner to them, under their promise that, after taking out the amount due, they would return the balance of his interest to him ; and that, instead of returning the balance to him, after deducting the indebtedness, they delivered it over to their co-defendants, one of whom was the owner of the other half-interest only. This allegation, if true, was a wrong for which the plaintiff was entitled to a remedy, and not only against the defendants Booker and Hinckley, but also against Allen Brothers, who, through the false representations alleged to have been made by Arthur Allen, a copartner of the firm, controlled the conversion of the property in the manner stated, and defrauded the plaintiff thereof, and it was not error for the court to receive evidence tending to prove such allegations.

The second and third objections may be considered together. The supreme court of Vermont, in case of *Sheple v. Page et al.*, 12 Vt. 519, held that "in an action on the case in the nature of a conspiracy, the gist of the action is the damage to the plaintiff and not the conspiracy. (2.) Where conspiracy is charged in a declaration between two or more, the acts of one, in pursuance of the conspiracy, are the acts of all in legal contemplation, and may be alleged in such case in the declaration as the individual acts of the one."

The case of *Jones v. Baker*, 7 Cowen, 445, was an action for a conspiracy. In the opinion the court, by C. J. Savage, said: "A writ of conspiracy, properly so called, did not lie at the common law in any case, but where the conspiracy was to indict the party either of treason or capital felony, * * * and such writ must be brought against two at least. All the other cases of conspiracy in the books were but actions on the case, though it was usual in such actions to charge a conspiracy. Yet they might be brought against one. (1 Saunders, 230, note 4; *Savill v. Roberts*, 1 Ld. Raym., 378, 379.) *Savill v. Roberts* was an action against one only, for procuring the plaintiff to be indicted of a riot. It was an action on the case and was held to lie. The case of *Subley v. Mott* and another (1 Wils., 210), was a special action on the case for a malicious prosecution. After verdict against one only a motion was made in arrest, in answer to which it was argued that this was an action on the case founded on a wrong, where, if any one be found guilty, the plaintiff should have judgment, and of that opinion was the whole court; and they considered such to be the settled law since the case of *Skinner v. Gunton and others* (1 Saunders, 230.)

\* \* \*

"An actual conspiracy can seldom be proved unless by circumstances; but if there be no evidence of conspiracy, the plaintiff may recover against one alone where there is sufficient evidence against him though not enough against the other. This being an action founded in tort, one defendant may be found guilty and the other have a verdict in his favor. The damage here is the gist of the action, not the conspiracy; the plaintiff showed damage, and if it resulted from the wrongful acts of the defendants, or either of them, the plaintiff was entitled to recover."

From these examples I conclude that although the plaintiff in the petition charged a conspiracy against Booker and Hinckley and the Allen Brothers, yet it was not neces-

sary to his recovery that there should be actual evidence that the defendants conspired together, nor that any of the peculiar rules governing the trial of an indictment for criminal conspiracy prevail on the the trial of the case at bar. It was therefore competent, if the jury believed from the evidence that the plaintiff suffered a wrong from the fraudulent acts of the defendants Allen Brothers, perpetrated through Arthur Allen and their attorney, Fitz, in taking possession of his store, fraudulently inducing him to sign a bill of sale, and converting his goods and turning them over to their co-defendants, Booker and Hinckley, or either of them, or to other parties—it was competent for the jury to return their verdict for the plaintiff for the amount of his damages so sustained, though there might have been no proof that any two of the defendants actually conspired together for the purpose of perpetrating such wrong upon the plaintiff.

The judgment of the district court is affirmed.

JUDGMENT AFFIRMED.

THE other Judges concur.